**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

LESLY METHELUS, on behalf of Y.M., a minor; ROSALBA ORTIZ, on behalf of G.O., a minor; ZOILA LORENZO, on behalf of M.D., a minor; on behalf of themselves and all other similarly situated,
Plaintiff

vs.

No. 2:16-cv-00379-SPC-MRM

THE SCHOOL BOARD OF COLLIER COUNTY, FLORIDA and KAMELA PATTON, Superintendent of Collier County Public Schools, in her official capacity,
Defendants
_______________________________________/

## INTEREST OF THE UNITED STATES

The United States has authority to file this Statement of Interest pursuant to 28 U.S.C. § 517, which permits the Attorney General to attend to the interests of the United States in any case pending in a federal court. This litigation implicates a matter of critical national importance – the right of English Learner (EL) students to equal access to a high-quality education.

The United States submits this Statement of Interest to assist the Court in evaluating Plaintiffs' claims under the Equal Educational Opportunities Act (EEOA), 20 U.S.C. § 1701 *et seq*., and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d–2000d-7, and its implementing regulations, *see e.g.* 28 C.F.R. Part 42, 34 C.F.R. Part 100 (Title VI). The U.S. Department of Justice (DOJ) is responsible for enforcing the EEOA, *see* 20 U.S.C. §§ 1706, 1709 (authorizing DOJ to bring suit and to intervene in private cases), and ensuring that courts correctly interpret the statute, including its requirement that schools take "appropriate action" to serve EL students, 20 U.S.C. § 1703(f). DOJ also is responsible for ensuring consistent enforcement of Title VI across the federal government under Exec. Order No. 12250, Leadership and Coordination of Nondiscrimination Laws, 45 Fed. Reg. 72,995 (Nov. 2 1980), and enforces

Title VI in federal court. The United States is uniquely situated to aid the Court in analyzing the legal standards applicable to both statutes, having enforced both the EEOA and Title VI on behalf of EL students for decades, and having promulgated guidance explaining school districts' statutory obligations under both laws.[1]

## BACKGROUND

Plaintiffs – the parents and guardians of EL students named Y.M., G.O., M.D., T.J.H., K.V., and N.A. who are either Haitian or Guatemalan (Plaintiff ELs) – allege that the School Board of Collier County, Florida (Board) and the Superintendent deny their immigrant EL children equal educational opportunities based on national origin, including their foreign birth and limited English proficiency. Am. Compl. (Doc. 30) ¶¶ 1, 9–14, 124–25. Among other claims, Plaintiffs bring individual and class claims under the EEOA and Title VI. *Id.* ¶¶ 5, 100, 121–130 (EEOA/Count I), 131–141 (Title VI/Count II).

According to Plaintiffs' Amended Complaint, Board practices deny "recently-arrived, foreign-born, ELL[2] students" ages 15 and older enrollment in regular high schools. *Id.* ¶ 45. Plaintiffs allege that the Board "purports to rely on" a February 2013 policy barring enrollment of students ages *17 or older* in the regular high school program if they cannot meet graduation requirements prior to the end of the school year in which they turn 19 (Policy). *Id.* ¶¶ 43–44. Under that Policy, such students cannot attend the regular high school program but must be afforded the opportunity to pursue a high school diploma through the Board's Adult High School or General Educational Development (GED) programs. *Id.* ¶ 43. Plaintiffs also assert that the Board adopted the Policy, which revised an earlier policy regarding the enrollment of students

[1] The United States is addressing only the legal standards applicable to Plaintiffs' claims under § 1703(f) of the EEOA and an intentional discrimination claim based on national origin under Title VI.

[2] While Plaintiffs use the term "ELL" in their Amended Complaint, federal guidance uses this term along with "EL" and "LEP." All are interchangeable.

ages 18-21, after a "sharp increase in the number of unaccompanied minors arriving to the United States from abroad," most of whom were 16 or 17. *Id.* ¶ 41, 102–106 & Ex. 2. Although the Policy does not delineate between currently enrolled and prospective students, Plaintiffs allege that a district employee represented to the Board that the Policy targets "new kids enrolling at our schools." *Id.* ¶ 47.

Plaintiffs further allege that the Board relies on the Policy as part of a larger "practice of denying high school enrollment to recently-arrived, foreign-born ELL students" age 15 and older, in contravention of the Policy's express terms and federal EL requirements, including those in the District's EL Plan. *Id.* ¶¶ 45, 50–64. According to the Amended Complaint, the Board refers some of these students to "noncredit, adult English for Speakers of Other Languages (Adult ESOL) classes that charge a fee" and that offer no opportunity to obtain a standard diploma, learn core subjects, or participate in high school activities. *Id.* ¶¶ 3–4, 51–52, 56-61. Plaintiffs allege that, since 2013, several hundred foreign-born children between the ages of 15 and 18 have been denied enrollment in regular high schools and found their way to these Adult ESOL programs. *Id.* ¶ 53. In contrast, Plaintiffs allege that the Board permits students 15 and older who are not recently arrived, foreign-born ELs to enroll in or continue to attend a regular high school even though they are far behind and not on track to graduate. *Id.* ¶¶ 46–47.

Plaintiffs recount that when they tried to enroll Y.M. (age 15), G.O. (age 16), M.D. (age 16), and T.J.H. (age 17) at Immokalee High School, all four were denied admission, and three were told to enroll in Immokalee Technical Center, which offers an Adult ESOL program for $30 per semester. *Id.* ¶¶ 67–68, 71–72, 74, 94. Plaintiffs further allege that when K.V. (age 16 in her third year of high school in Haiti) tried to enroll at Golden Gate High School, a Board employee "told K.V. that she could not enroll because she did not speak English well … and did

not have enough credits." *Id.* ¶ 80. Board employees did not advise K.V. of any alternate enrollment options. *Id*. They similarly failed to advise N.A. (age 17) of other enrollment options when denying his enrollment at Lely High School for being "too old" and at Golden Gate High School for being "no longer eligible" for a regular diploma or alternative program. *Id.* ¶¶ 87, 89. K.V. and N.A. found Adult ESOL Programs on their own and paid $30 to attend. *Id.* ¶¶ 81, 90.

Plaintiffs allege that the Adult ESOL programs that Plaintiff ELs and hundreds like them were referred to (or located on their own) do not teach math, science, social studies, or the standard curriculum that ELs are entitled to under federal law and the District EL Plan. *Id.* ¶¶ 32, 39, 57, 68, 72, 76, 95. Further, unlike non-ELs and ELs receiving EL services in regular high school, and in contravention of state law and the District EL Plan, ELs in Adult ESOL programs must pay $30 and cannot earn credit toward a standard diploma. *Id.* ¶¶ 40, 58.

The Board moved to dismiss, Defs.' Mot. to Dismiss (MTD) (Doc. 37), erroneously arguing that it satisfies its federal obligations. MTD at 2, 3, 9, 11. The Board repeatedly invokes the February 2013 Policy, but ignores Plaintiffs' allegations that: the Board's actions are not consistent with the Policy; the Policy is intentionally discriminatory and is discriminatorily applied; and the Adult ESOL programs provide no opportunity to participate in the standard instructional program. *Id.* 7, 12, 14. Instead, the Board asserts that Plaintiff ELs were ineligible for regular high school because two were not already enrolled in school, none had the "demonstrated proficiency in English, Mathematics, Social Studies, and Science" required to enter high school, and none, in the Board's view, could complete high school by 19. *Id.* 7–8.

**ARGUMENT**

Both the EEOA and Title VI prohibit States and school districts from denying equal educational opportunity to individuals based on their national origin. *See* 20 U.S.C. § 1703; 42

U.S.C. § 2000d. Decades of federal case law and guidance interpreting the EEOA and Title VI and its implementing regulations establish both that school districts must make their standard instructional programs accessible to ELs through language assistance programs and that discrimination against limited English proficient (LEP) persons can give rise to a claim of unlawful national origin discrimination. In arguing that this Court should dismiss Plaintiffs' EEOA and Title VI claims, the Board misconstrues governing legal standards, cites cases out of context, and invokes a Policy that Plaintiffs have alleged provides Plaintiff ELs no access to the standard instructional program and is intentionally discriminatory.

Rather, taking Plaintiffs' alleged facts as true, as this Court must at the motion to dismiss stage, Plaintiffs have adequately pled violations of § 1703(f) of the EEOA and Title VI based on the Board's denial of Plaintiff ELs' enrollment in its regular high school program[3] and its referral, if any, of Plaintiff ELs to inadequate educational programs.

## I. The EEOA Requires "Appropriate Action" To Overcome Language Barriers That Impede ELs' Equal Participation In Its Standard Instructional Program

### A. The Board's Obligations Under The EEOA

The EEOA prohibits States from denying equal educational opportunity to any person "on account of his or her race, color, sex, or national origin." 20 U.S.C. § 1703. Such a denial occurs when, *inter alia*, a state or local education agency fails "to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs." *Id*. District courts have held that in order to state a plausible claim for national origin discrimination under § 1703(f), ELs need only allege facts showing "(1) language barriers; (2)

[3] The Board's practice of denying enrollment to recently-arrived, foreign-born EL students in its regular high schools and referring them to Adult ESOL programs that charge a fee bears some similarity to the policies and practices struck down by the Supreme Court as unlawful in *Plyler v. Doe*, 457 U.S. 202, 222 (1982) (striking down a state law denying free public education to undocumented immigrant students as well as a school district's attempt to charge such students an annual tuition fee as unlawful intentional discrimination).

defendant's failure to take appropriate action to overcome these barriers; and (3) a resulting impediment to students' equal participation in instructional programs." *C.G. v. Pa. Dep't of Educ.*, 888 F.Supp. 2d 534, 575 (M.D. Pa. 2012) (internal citation omitted); *see also Leslie v. Bd. of Educ. for Ill. Sch. Dist. U-46*, 379 F.Supp. 2d 952 (N.D. Ill. 2005); *Khadidja v. Sch. Dist. of Lancaster*, 5:16-CV-03881-EGS, 2016 WL 4493202, at *2–8 (E.D. Pa. Aug. 26, 2016) (applying *C.G.* and *Castañeda v. Pickard*, 648 F.2d 989 (5th Cir. 1981) in decision granting preliminary injunction under the EEOA to EL refugee plaintiffs ages 17-20 who were denied enrollment in regular high school program and placed in an alternative, credit recovery program where they could earn "a diploma and all of the attendant benefits."), *expedited appeal filed*, No. 16-3528 (3d Cir. Sept. 2, 2016).

Neither the text nor legislative history of the EEOA defines "appropriate action" for purposes of § 1703(f). In *Castañeda*, a case that controls here,[4] the Fifth Circuit interpreted § 1703(f) by establishing a three-part framework for assessing state and local education agencies' compliance with §1703(f). Under that framework, this Court must consider whether: (1) the Board's EL program is based upon a sound educational theory; (2) the program, in practice, is reasonably calculated to implement effectively that theory, including the provision of sufficient resources and personnel; and (3) the program has been successful after a legitimate trial period. *Id.* at 1009–10. Plaintiffs need not prove discriminatory intent to establish a violation of § 1703(f). *See id.* at 1007–08. In interpreting § 1703(f) and establishing the three-part test, *Castañeda* relied on *Lau v. Nichols*, 414 U.S. 563, 568 (1974), a decision that Congress codified in § 1703(f) and that required schools to provide English language instruction to ELs to ensure their meaningful participation in regular education programs. *Castañeda*, 648 F.2d at 1008.

[4] Decisions of the former Fifth Circuit rendered before October 1, 1981 – such as *Castañeda* – serve as binding precedent of the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

*Castañeda* enables education officials to adopt the types of EL programs that will be most responsive to student needs. *See Castañeda*, 648 F.2d at 1008–09; *Horne v. Flores*, 557 U.S. 433, 454 (2009). Yet *Castañeda* recognized that Congress intended to ensure that states and school districts "made a genuine and good faith effort" to implement sound EL programs "to remedy the language deficiencies of their students and deliberately placed on federal courts the difficult responsibility of determining whether that obligation had been met." 648 F.2d at 1009. *Castañeda* then proceeded to establish the three-part test to assist courts in evaluating whether a district's EL program satisfies its obligations under § 1703(f). *Id.* at 1009–10.

*Castañeda* makes clear that a district's EL program may not permanently sacrifice or even unreasonably delay academic instruction in favor of English language development (ELD). *Id.* at 1011. Rather, "§ 1703(f) leaves schools free to determine the sequence and manner in which [EL] students tackle this dual challenge [of learning English and academic content] *so long as* the schools design [EL] programs which are reasonably calculated to enable [ELs] to attain parity of participation in the standard instructional program within a reasonable length of time." *Id.* at 1011 (emphasis added). Under *Castañeda*, schools may implement EL programs that emphasize ELD "during the early part of [students'] school career[s] . . . even if the result of such a program is an interim sacrifice of learning in other areas during this period." *Id.* at 1011. Yet, *Castañeda* cautioned such schools that "to be able ultimately to participate equally with the students who entered school with an English language background, [ELs] will have to . . . recoup any deficits which they may incur in other areas of the curriculum as a result of th[eir] extra expenditure of time" acquiring English. *Id*. Mindful of the "equal participation in instructional programs" language in § 1703(f), the Court thus concluded that § 1703(f) imposes "a duty to provide [ELs] with assistance in other areas of the curriculum where their equal participation

may be impaired because of deficits incurred [while] participat[ing] in" the EL program. *Id.* If no such opportunity to recoup academic deficits is provided, the Court explained, "the language barrier, although itself remedied, might, nevertheless, pose a lingering and indirect impediment to [ELs'] equal participation in the regular instructional program." *Id.*

The Departments of Education and Justice summarized these requirements in their joint 2015 Dear Colleague Letter on EL Students and LEP Parents (EL DCL): "To ensure that EL students can catch up in those core areas within a reasonable period of time, such districts must provide compensatory and supplemental services to remedy academic deficits that the student may have developed while focusing on English language acquisition." MTD at 13 (quoting EL DCL at 19).This summary is entirely consistent with § 1703(f) and the binding *Castañeda* standards just described.[5] Ignoring these standards, the Board asks this Court to reject this guidance on the basis of a case that is not binding and completely at odds with these standards. *See infra* discussion of *Flores v. Huppenthal*, 789 F.3d 994 (9th Cir. 2015) at 11-12.

**B. The Board Cannot Show Plaintiffs' EEOA Claim Fails As A Matter Of Law**

Here, Plaintiffs allege facts sufficient to survive a motion to dismiss under the *Castañeda* standards. In particular, Plaintiffs allege that, contrary to the Board's EEOA duty to offer a sound EL program that enables ELs to attain parity of participation in the standard instructional program, the Board denied Plaintiff ELs access to its free EL program and standard instructional program altogether by refusing to enroll them in regular high schools. Am. Compl. ¶¶ 67–89. More specifically, as to ELs ages 15 and 16, Plaintiffs allege that the Board denied them

[5] *Castañeda*'s interpretation of § 1703(f) controls here, but even if it did not, this guidance regarding the EEOA, Title VI, and its implementing regulations is entitled to substantial deference because DOJ and ED are the agencies tasked with enforcing the EEOA, Title VI, and their implementing regulations. *See Chevron U.S.A. v. NRDC*, 467 U.S. 837, 843–44 (1984) (where a statute that an agency administers is silent with respect to a specific issue, the question is whether the agency's interpretation is "based on a permissible construction of the statute"); *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (deference is warranted provided agency interpretation is not "plainly erroneous or inconsistent with the regulation[s]").

enrollment in the regular high school program in contravention of the Board's own Policy. As to K.V. (16), Plaintiffs allege that the Board assumed her inability to timely graduate based on her limited English and did not offer her any enrollment option. *Id.* ¶ 80. Even when the Board referred some Plaintiff ELs to Adult ESOL programs, these referrals did not satisfy the Board's own Policy mandate to offer a high school diploma or GED. *See Id.* ¶ 43 & Ex. 2. Nor did those Adult ESOL programs meet *Castañeda*'s standards because they cost $30 per semester and offer no math, science, or social studies, and no credit toward a standard diploma.

In a recent case involving similar claims, the court denied the school district's motion to dismiss EEOA and Title VI claims. *See New York by Schneiderman v. Utica City Sch. Dist.*, 2016 WL 1555399 (N.D.N.Y 2016). In *Utica*, the plaintiff alleged that the district intentionally denied immigrant ELs aged 17-20 enrollment in the regular high school program and diverted them to alternative programs that offered "little more than basic instruction in the English language" and "a high school equivalency program," but not a regular diploma. *Id.* at *1–2. In refusing to dismiss the EEOA claim, the court relied upon allegations that the ELs had been "denied equal educational opportunities on the basis of their national origin as part of a diversionary policy enacted and enforced by senior policymakers in the District." *Id.* at *10. Like the plaintiffs in *Utica,* Plaintiffs here plead a plausible claim under § 1703(f) of the EEOA.

The Board does not refute Plaintiffs' allegations. Nor could it on a motion to dismiss. Instead, the Board incorrectly argues that the EEOA: (1) gives it "latitude" to offer Adult ESOL programs with no core content instruction or way to earn a regular diploma; (2) allows it to deny ELs enrollment in regular schools because they lack "demonstrated proficiency in English, Mathematics, Social Studies, and Science" and are thus "unqualified" for high school; and (3)

allows it to "legally send [ELs] to English Language and adult education programs" based on a misreading of the EEOA and the federal guidance in the EL DCL. MTD at 8, 11–12 & n.22.

To be sure, step one of the three-part test in *Castañeda* (which the Board ignores) gives officials "substantial latitude" to choose among educationally sound EL programs. *See* 648 F.2d at 1008–10. However, such "latitude" does not include the wholesale exclusion of ELs from the Board's regular schools. Indeed, such an interpretation flatly contradicts Congress's intent to codify *Lau* in § 1703(f) and leads to absurd results. In *Lau,* California's graduation and compulsory education standards, which closely resemble those of Florida,[6] informed the Court's holding that districts must help ELs learn English so that they have a meaningful opportunity to earn a regular diploma. *Id*. In reaching this holding, the Court rejected the "unqualified" argument that the Board now urges, concluding that to mandate English skills as a prerequisite to participation in the standard educational program would be "to make a mockery of public education." *Id*. Indeed, if a district can deny ELs enrollment in regular high schools based on "academic qualifications," MTD at 8, then new EL immigrants of any age could be denied enrollment in regular schools since their language barriers and schooling abroad often will mean that they lack the academic prerequisites for a given age/grade in U.S. schools. In codifying *Lau*, Congress rejected this senseless outcome.

The Board also quotes selectively from *Horne* to argue for unfettered "latitude in choosing the programs and techniques … to meet [its] obligations under the EEOA," MTD at 12, but omits that *Horne* itself relied on *Castañeda*. The language the Board quotes, when read in

---

[6] California required "proficiency in 'English,' as well as other prescribed subjects" to obtain a high school diploma, and made education compulsory for "children between the ages of six and 16 years." *Lau*, 414 U.S. at 566. The Board suggests that its EEOA and Title VI duties to ELs end at age 16 based on Florida law. MTD at 4-5. While the EEOA and Title VI afford districts and states some latitude over how they will provide ELs access to their regular education programs, a state or school district cannot deny this access entirely. *See Hillman v. Maretta,* 133 S. Ct 1943, 1949–50 (2013); 42 U.S.C. § 2000h-4 (invalidating any provision of State law when "such provision is inconsistent with any of the purposes of [Title VI]").

context, makes clear that the "latitude" afforded to schools applies only to the type of EL program and techniques offered – for example, bilingual education – and must be exercised in "good faith" to ensure ELs' meaningful participation in the standard instructional program. *Castañeda*, 648 F.2d at 1009;[7] *see also id.* at 1011. Indeed, in both *Horne* and *U.S. v. Tex.*, 601 F.3d 354 (5th Cir. 2010), another case the Board cites for its purported "latitude" to exclude ELs from regular schools, the courts applied *Castañeda* to examine the EEOA claims. *Horne*, 557 U.S. at 440–41, 454; *Texas*, 601 F.3d at 367–73. Far from supporting an argument that this Court should dismiss Plaintiffs' EEOA claim, the cases demonstrate the fact-intensive inquiry courts must undertake to determine if districts are meeting their obligations under § 1703(f).

The Board's reliance on *Flores v. Huppenthal*, 789 F.3d 994 (9th Cir. 2015), is similarly misplaced. *See* MTD at13. Although *Huppenthal* invoked *Castañeda*'s "latitude" quote in stating that the EEOA does not impose an obligation on schools to assist ELs in recovering academic content they have missed while in intensive ELD programs, this statement flatly conflicts with *Castañeda*'s interpretation of § 1703(f), which is binding on this Court. *Huppenthal*, 789 F.3d at 1007 (quoting *Castañeda*, 648 F.2d at 1009). The rest of the *Castañeda* opinion explains that the "latitude" to choose among EL programs is limited by "a duty to provide [EL] students with assistance in other areas of the curriculum where their equal participation may be impaired

---

[7] By lifting the following "latitude" quote out of context, the Board misinterprets *Castañeda* and § 1703(f):

> Congress, in describing the remedial obligation it sought to impose on the states in the EEOA, did not specify that a state must provide a program of 'bilingual education' to all limited English speaking students. We think Congress' use of the less specific term, 'appropriate action,' rather than 'bilingual education,' indicates that Congress intended to leave state and local educational authorities a substantial amount of latitude in choosing the programs and techniques they would use to meet their obligations under the EEOA. However, by including an obligation to address the problem of language barriers in the EEOA and granting [EL] students a private right of action to enforce that obligation in s 1706, Congress also must have intended to insure that schools made a genuine and good faith effort, consistent with local circumstances and resources, to remedy the language deficiencies of their students.

*Id.*

because of deficits incurred during participation in an agency's [EL] program." *Id.* at 1011. Here, Plaintiffs allege that Adult ESOL programs do not even teach other areas and provide no access to the standard program. Further, *Huppenthal* addressed only whether the district court abused its discretion under Federal Rule 60(b)(5) in granting Arizona's request for relief from a decades-old judgment for alleged violations of the EEOA based on changed circumstances. *See id.* at 997–998, 1001–1008. The post-trial, fact-intensive analysis in *Huppenthal* under Rule 60(b)(5) does not support dismissal under Rule 12(b)(6) of Plaintiffs' EEOA claim here, especially where Plaintiffs allege that the Board has denied them any semblance of a high school education.[8]

Lastly, the Board's argument that the EEOA allows it to "legally send" Plaintiff ELs to Adult ESOL programs misreads this same "latitude" quote as well as federal guidance. MTD at 11-12 & n.22. Consistent with § 1703(f) and *Castañeda*'s standards, federal guidance advises districts to "place EL students in age-appropriate grade levels so that they can have meaningful access to their grade-appropriate curricula and an equal opportunity to graduate" and cautions districts against placing older ELs who are below grade level in age-inappropriate programs that do not teach core content courses that earn credit toward graduation. EL DCL at 18 & n.50. Neither this guidance nor § 1703(f) allows the Board to exclude ELs from regular high schools and offer only fee-based Adult ESOL programs with no core content instruction. Further, placing 15- to 17-year old ELs in regular high schools is more age-appropriate than placing them with "adults, some of whom are older than the students' parents or grandparents." Am Compl. ¶ 62.

[8] The Board faults Plaintiffs for not alleging different treatment of similarly situated comparators, MTD at 12, but § 1703(f) does not require proof of intentional discrimination, *Castañeda*, 648 F.2d at 1008. And offering immigrant ELs an equal opportunity to participate in the standard instructional program and earn a regular high school diploma is the very type of equal treatment that lies at the heart of the EEOA's "appropriate action" requirement – and not "preferential treatment," as the Board contends. 20 U.S.C. § 1703(f); MTD at 12.

## II. Title VI Prohibits The Board From Engaging in National Origin Discrimination

### A. Intentional Discrimination Under Title VI

Plaintiffs allege that the Board's Policy, as applied, excludes recently-arrived foreign-born students who are 17 or older who, in the view of the Board, cannot meet graduation requirements by the age of 19, and is intentionally discriminatory on the basis of national origin in violation of Title VI. Title VI states that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. To establish a Title VI violation, private litigants must prove a defendant acted with discriminatory intent. *See Alexander v. Sandoval*, 532 U.S. 275 (2001); *Sirpal v. Univ. of Miami*, 684 F.Supp.2d 1349, 1357 (S.D. Fl. 2010) ("to state a claim under Title VI, a plaintiff must allege facts establishing discriminatory intent.").

To assess whether a facially neutral policy, such as the Board's Policy here, was enacted, at least in part, with discriminatory intent, courts must undertake a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). In doing so, courts rely on factors set forth in *Arlington Heights*, including: a challenged policy's discriminatory impact, which "may provide an important starting point" in discerning a decisionmaker's intent; the historical background; the sequence of events preceding the policy's enactment; substantive and procedural departures from normal decision-making processes; and contemporaneous statements by decisionmakers. *See id.* at 265–268. These factors are neither all required nor exhaustive and include the foreseeability and knowledge of a discriminatory impact, as well as the availability of less discriminatory alternatives. *See Jean v. Nelson*, 711 F.2d 1455, 1486 (11th Cir. 1983). When

establishing intent under *Arlington Heights*, "the plaintiff need provide very little such evidence ... to raise a genuine issue of fact ...; any indication of discriminatory motive ... may suffice to raise a question that can only be resolved by a fact-finder." *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1159 (9th Cir. 2013) (citations omitted).

In arguing that Plaintiffs fail to state a Title VI claim of national origin discrimination, the Board urges application of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which provides a test for employment discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e–2000e-17. *See* MTD at 14-16. While the *McDonnell Douglas* framework is one way of demonstrating intentional discrimination based on national origin, it is not the appropriate framework to prove intentional discrimination under Title VI in this case. The totality of the relevant facts can show that national origin discrimination was the motivation behind a facially neutral law. *See Washington v. Davis*, 426 U.S. 229, 242 (1976); *Arlington Heights*, 429 U.S. at 264-68; *cf. Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) (*McDonnell Douglas* framework is generally more appropriate for individual claims). Given the neutral policy and facts alleged here, the *Arlington Heights* framework is more appropriate. *See Elston v. Talladega Cty. Bd. of Educ.*, 997 F.2d 1394 (11th Cir. 1993) (applying *Arlington Heights* in Title VI intent case); *Burton v. City of Belle Glade*, 178 F.3d 1175 (11th Cir. 1999).

In determining whether a neutral policy is intentionally discriminatory, a court must also evaluate whether it is applied in a discriminatory way, as Plaintiff ELs have alleged. *See Yick Wo v. Hopkins*, 118 U.S. 356 (1886).

### B. The Board Cannot Establish That Plaintiffs' Title VI Claim Of Intentional National Origin Discrimination Fails As A Matter Of Law

Under the *Arlington Heights* framework, Plaintiffs adequately allege facts sufficient to state a plausible Title VI claim, and the inapposite cases the Board cites do not defeat this claim.

### 1. Plaintiffs State a Title VI Claim of Intentional Discrimination

Plaintiffs' allegations include precisely the types of facts that courts regularly examine under *Arlington Heights* when evaluating intentional discrimination claims. Plaintiffs, for example, point to the discriminatory impact of the Board's policy, which provides an "important starting point" in the intent analysis. *Arlington Heights*, 429 U.S. at 266 (citing *Davis*, 426 U.S. at 229). They allege that several hundred foreign-born children between the ages of 15 and 18 have found their way to Adult ESOL programs after being denied access to the Board's regular high school program, including a free education, core content, credits toward a school diploma, academic enrichment, sports, and extracurricular activities; and that the Board is aware of this fact. Am. Compl. ¶¶ 4, 53–54, 61, 135. More specifically, Plaintiffs allege that in the 2015-2016 school year alone, at least 369 foreign-born students under the age of 18 were attending the Adult ESOL programs instead of Collier's regular high school. *Id.* ¶ 106.

Based on the timing, a fact-finder could determine that the Board's decision to amend its policy to constrict access to a regular high school program was motivated, at least in part, by intent to exclude newly arrived foreign-born ELs based on national origin. Until August 1, 2013, the Board's policy permitted persons to attend the regular high school program until they were 21. *Id.* Ex. 2. This earlier policy excluded people at age 18 only if they could not meet graduation requirements by the end of the school year during which they became 21 (i.e., up to three years later). *Id.* Only after the recent influx of unaccompanied EL minors arriving from abroad did the Board alter its policy to lower the age from 21 to 19 and exclude youth at age 17 if they could not, by the end of the school year during which they became 19 (i.e., up to 2 years later), meet the graduation requirements. *Id.* ¶¶ 41–43, 47, 147. For both policies, the Board asserted the purpose of keeping consistent maturity levels among high school students, even as it allegedly

applied the policy to students as young as 15. *Id.* Ex. 2. In addition to the timing, Plaintiffs allege that despite the Policy's express terms, which apply to both currently enrolled and prospective students, District employees explained to the Board that the Policy targeted "new kids enrolling at our schools." *Id.* ¶ 47. Again, a fact-finder could determine that the "new kids" referred to the influx of "recently-arrived, foreign-born, ELL students."

Plaintiffs also allege that the Board was aware of the harm to ELs created by its Policy, and nonetheless refused to remove those barriers. *See id.* ¶¶ 27-28, 32, 42, 54-56, 59, 98-99, 134; *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 272 (3d Cir. 2014) (applying deliberate indifference standard to Title VI intentional claim); *Utica City Sch. Dist.*, 2016 WL 1555399 at *9–10.[9]

Plaintiffs further allege that the Board applies its Policy in a discriminatory manner. Upon Plaintiffs' information and belief, in contrast to its treatment of recently-arrived, foreign born ELs ages 15 and older, the Board permits students 15 and older "who are not recently arrived, foreign born, ELL students . . . to either enroll in or continue to attend Collier County public schools . . . and earn credits toward a standard high school diploma," including those "who are not on track to graduate." *Id.* ¶¶ 45–46. Plaintiffs allege that because officials conduct no individualized assessments of ELs' English or academic skills, enrollment decisions are based on discriminatory assumptions that these ELs will fail academically. *Id.* ¶ 49. In further support of an inference that the Board's "neutral" Policy is a pretext for national origin discrimination, Plaintiffs claim that the Board imposes a $30/semester cost on ELs sent to Adult ESOL classes

---

[9] *See also Faith Action for Cmty. Equity v. Haw.*, 2015 WL 751134, at *7 (D. Haw. 2015); *Almendares v. Palmer*, 284 F. Supp. 2d 799, 806 (N.D. Ohio 2003) ("disparate impact, history of the state action, and foreseeability and knowledge of the discriminatory onus placed upon the complainants" is the type of circumstantial evidence upon which a case of intentional discrimination is often based.) (citations omitted); *Cabrera v. Alvarez*, 977 F.Supp. 2d 969, 973 (N.D. Cal. 2013) (a year before the lawsuit the plaintiff filed a complaint with the recipient "citing the failure to provide language translation services and the uninhabitable and unremedied living conditions").

and fails to keep records of attempts to enroll these EL children in regular high schools. *Id.* ¶¶ 47–48; *see Utica*, 2016 WL 1555399 at *10 (that district employees did not keep records, among other factual allegations, states a plausible claim of intentional discrimination under Title VI).

Plaintiffs also allege the Board's actions depart substantively and procedurally from its Policy and state law. *Id.* ¶¶ 50–64. The Policy expressly applies to students over the age of 17, but the Board allegedly departs from the criteria set out in its own Policy by applying it to 15- and 16-year-old ELs. *Id.* ¶ 44. The Board also allegedly turned away two Plaintiff ELs without offering them an adult program at all, even though the Policy is phrased in mandatory terms (person excluded "shall be afforded an opportunity to pursue a high school diploma" through other "programs of the District"). *Id.* ¶¶ 80, 89. Plaintiffs further allege deviations from state law: that students 16 and older are only "adults" under Florida law if they file a formal declaration of intent to terminate school enrollment with a school board. *Id.* ¶ 21. None of the named ELs filed such a declaration or was given the opportunity to appeal Collier's denial of their enrollment; all want to continue their education. *Id.* ¶ 97. Charging EL students a fee for English instruction is also inconsistent with state and federal requirements.[10] *Id.* ¶¶ 4–6. Plaintiffs' factual allegations easily lend themselves to the sensitive, fact-intensive inquiry required under *Arlington Heights* and are sufficient to state a claim of intentional discrimination under Title VI.

**2. Plaintiffs Allege National Origin Discrimination**

A policy that denies or limits ELs' opportunity to participate in a federally funded program based on language barriers has long been recognized as implicating Title VI's protections against national origin discrimination because there is an obvious nexus between limited English proficiency and national origin. *See Lau*, 414 U.S. at 568 ("[i]t seems obvious

---

[10] *See* Dep't of Justice, Guidance to Fed. Fin. Assistance Recipients Re. Title VI Prohibition Against National Origin Discrimination Affecting [LEP] Persons, 67 Fed. Reg. 41,455 (Jun. 18, 2002); *see also* Fla. Const. art. IX, § 1(a) (requiring a free public education).

that the Chinese-speaking minority receive fewer benefits than the English-speaking majority from respondents' school system which denies them a meaningful opportunity to participate in the educational program"). The non-binding cases the Board cites, such as *Mumid v. Abraham Lincoln High Sch.*, 618 F.3d 789 (8th Cir. 2010), MTD at 16, overlook this longstanding Title VI precedent and ignore the sensitive inquiry that *Arlington Heights* demands. Indeed, a court recently declined to follow *Mumid*, noting "the absence of any discussion [in *Mumid*] of the Supreme Court's decision in *Lau*." *U.S. v. Maricopa Cty.*, 915 F.Supp. 2d 1073, 1081 (8th Cir. 2012).

The Board asserts that Plaintiffs have not adequately pled a claim of intentional national origin discrimination under Title VI because "language and national origin are not interchangeable." MTD at 16 (citing *Mumid*).[11] As we understand Plaintiffs' Amended Complaint, however, they do not claim that language and national origin are always interchangeable, such that a language barrier always results in intentional national origin discrimination. Rather, they allege that denying recently-arrived foreign-born ELs the opportunity to participate in the standard educational program, when examined in light of the totality of facts, can give rise to a claim of intentional national origin discrimination.

Indeed, *Mumid* did not dismiss the plaintiffs' Title VI intent claim out of hand; rather, the claim was resolved on the basis of the record evidence at summary judgment. *See* 618 F.3d at 795. Moreover, regardless of the ultimate merits of the plaintiffs' Title VI claim in *Mumid*, the school district in that case, unlike the Board here, actually provided the plaintiffs an education. As relevant here, *Mumid* erred in limiting its Title VI analysis to whether the plaintiffs could establish intentional discrimination through a facially discriminatory policy, direct evidence of

[11] The Board's focus on language also overlooks that Plaintiffs allege that the Board engages in national origin discrimination against the foreign born.

discriminatory animus, or the *McDonnell Douglas* framework. *Id.* at 794–95. These approaches are not required to prove intentional discrimination under Title VI. Indeed, the court in *Mumid* did not even consider the settled *Arlington Heights* framework applicable here. [12]

### 3. The Board's Reliance on *Holton* Is Misplaced

Lastly, the Board argues that "the State's academic prerequisites for high school matriculation and adult education provide the kind of ability grouping that has been repeatedly upheld." MTD at 3 (citing *Holton v. City of Thomasville Sch. Dist.*, 490 F.3d 1257 (11th Cir. 2007)); *see also* MTD at 8–9 n.20, 11, 14, 16, 19. This line of Title VI cases, which rely on *McNeal v. Tate Cty. Sch. Dist.*, 508 F.2d 1017 (5th Cir. 1975), has no place here.[13] *McNeal* and its progeny, including *Holton*, address the narrow question of whether ability grouping is constitutionally permissible when it results in racially segregated *classrooms within a school* in a district that has a history of *de jure* segregation. *McNeal* affirms the "basic rule" prohibiting intentional segregation of students *within* schools and provides a standard for reviewing ability grouping across *classes* that has a disparate racial impact in districts with a history of *de jure* or *de facto* segregation that have or have not achieved unitary status. *McNeal*, 508 F.2d at 1019–20.

By contrast, the Plaintiffs here allege the Board has a policy of intentionally excluding recent immigrant ELs from its regular high schools altogether and funneling them to non-credit, Adult ESOL programs in violation of Title VI and the EEOA. *Holton* is not an EEOA or EL case, and in the few desegregation cases where EEOA or Title VI claims by ELs have arisen,

---

[12] The other cases the Board cites can be similarly distinguished. *See Soberal-Perez v. Heckler*, 717 F.2d 36, 38-41 (2d Cir. 1983) (Title VI claim against federal agency dismissed because Title VI does not apply to federally conducted programs and intent not alleged under Equal Protection claim); *Olagues v. Russioniello.* 770 F.2d 791 (9th Cir. 1985) (alleged facial classification under Voting Rights Act and U.S. Constitution)*; Santiago-Lebron v. Florida Parole Com'm*, 767 F. Supp. 2d 1340, 1349 (S.D. Fla. 2011) (language and national origin not interchangeable in federal inmate's habeas corpus case against the state bureau of prisons).

[13] The Board cites *Ga. State Conf. of Branches of NAACP v. Ga.*, 775 F.2d 1403 (11th Cir. 1985). MTD at 16. Like *Holton*, *Georgia* looks at ability grouping in the school desegregation context and is inapposite.

courts carefully isolated the claims, citing *McNeal* solely with respect to *classroom* segregation, and applying *Castañeda*'s three-part test to assess the adequacy of the EL program. *See, e.g.*, *Castañeda*, 648 F.2d at 995–99; *Morales v. Shannon*, 516 F.2d 411, 413 (5th Cir. 1975).[14] None of the cases contemplated complete exclusion of ELs from regular high school programs.

Further, even if Holton were apposite, it would not foreclose Plaintiffs' Title VI claim, which alleges that the Board is intentionally segregating recently-arrived ELs out of a desire to exclude them from the district's regular high school programs. Am. Compl. ¶¶ 4, 46–50, 67, 70–71, 74, 80, 86–87, 94. As the Eleventh Circuit made clear in its first *Holton* opinion: "'[S]chool systems are free to employ ability grouping, even when such a policy has a segregative effect, *so long, of course, as such a practice is genuinely motivated by educational concerns and not discriminatory motives.*'" 425 F.3d 1325, 1347 (11th Cir. 2005) (quoting *Castañeda*, 648 F.2d at 996–97) (emphasis in original). The *Holton* court went on to say that the proper resolution of such a case turns on a careful assessment of the facts. *Id.* at 1348.

**CONCLUSION**

The Board's motion to dismiss Plaintiffs' EEOA and Title VI claims should be denied.

Respectfully submitted,

A. LEE BENTLEY, III
United States Attorney
Middle District of Florida

*s/ Yohance A. Pettis*
YOHANCE A. PETTIS
Assistant United States Attorney
United States Attorney's Office

VANITA GUPTA
Principal Deputy Assistant Attorney General
EVE L. HILL
Deputy Assistant Attorney General

SHAHEENA SIMONS (CA 225520)
EMILY MCCARTHY (DC 463447)
Educational Opportunities Section

[14] *Morales* relies on *McNeal* when analyzing plaintiffs' claims concerning the segregation of Mexican-American students and cites the EEOA and *Lau* when examining plaintiffs' claims involving the lack of bilingual-bicultural instruction. 516 F.2d at 413, 415. Similarly, in *Castañeda*, Mexican-American students alleged, *inter alia*, that the school district used ability grouping that resulted in impermissible classroom segregation, and that court, citing *McNeal*, explained "[t]he rationale supporting judicial proscription of ability grouping" in the context of historically segregated schools. *Id.* at 996. Notably, the court applied the three-part test under § 1703(f) of the EEOA, not *McNeal* standards, to analyze the claim that the EL instruction was inadequate with respect to access to content.

Middle District of Florida
400 North Tampa Street, Suite 3200
Tampa, FL 33602
Fla. Bar No.: 021216
Fax: 813-274-6198
Phone: 813-274-6000
Email: yohance.pettis@usdoj.gov

CHRISTINE STONEMAN (DC 462557)
ANNA M. MEDINA (DC 483183)
Federal Coordination and Compliance Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W. - NWB
Washington, DC 20530
Telephone: (202) 353-3936
Email: anna.medina@usdoj.gov

Dated: September 26, 2016

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Statement of Interest of the United States of America has been filed electronically using the Court's Electronic Case Filing ("ECF") System, which sent a notice of filing activity to all attorneys of record. This document is available for viewing and downloading from the Court's ECF System.

*s/ Yohance A. Pettis*

YOHANCE A. PETTIS
Assistant United States Attorney
United States Attorney's Office
Middle District of Florida
400 North Tampa Street, Suite 3200
Tampa, FL 33602
Fla. Bar No.: 021216
Fax: 813-274-6198
Phone: 813-274-6000
Email: yohance.pettis@usdoj.gov

Dated: September 23, 2016