UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

LESLY METHELUS, ROSALBA ORTIZ,
ZOILA LORENZO, ANGE MARIE
JOSEPH, EMILE ANTOINE and
LUCENIE HILAIRE DUROSIER, on
behalf of Y.M., a minor, on behalf of
themselves and all others similarly
situated

        Plaintiffs,

v.                              Case No:   2:16-cv-379-FtM-38MRM

THE SCHOOL BOARD OF COLLIER
COUNTY, FLORIDA and KAMELA
PATTON,

        Defendants.

_____/

## OPINION AND ORDER[1]

    This matter comes before the Court on Defendants School Board of Collier County, Florida and Kamela Patton's Motion to Dismiss.  (Doc. 37).   Plaintiffs filed a timely response in opposition.  (Doc. 39).   In addition, the United States filed a Statement of Interest (Doc. 38), to which Defendants responded (Doc. 58), and Plaintiffs replied (Doc. 59).  For the following reasons, Defendants' motion is granted in part and denied in part.

---

[1] Disclaimer:  Documents filed in CM/ECF may contain hyperlinks to other documents or websites.  These hyperlinks are provided only for users' convenience.  Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees.  By allowing hyperlinks to other websites, this Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their websites. Likewise, the Court has no agreements with any of these third parties or their websites. The Court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

**BACKGROUND**[2]

Plaintiffs are the parents and guardians of foreign-born, English Language Learner ("ELL") children ("Plaintiff Children") who were allegedly denied access to a free public education in Collier County, Florida.  (Doc. 30).  According to Plaintiffs, the School Board and Superintendent Patton violated Plaintiff Children's rights, and those of hundreds of similarly situated ELL children, through a policy and practice of excluding such foreign-born children from public high school.  (*I* at ¶ 148; Doc. 39 at 1).

The story of each Plaintiff Child is similar.  At ages 15, 16, or 17, they came to the United States from Haiti or Guatemala and attempted to enroll in Collier County high schools for the 2015-2016 academic year.[3]  (Doc. 30 at ¶¶ 66-67, 70, 73-74, 77-78, 85-89, 93-94).  Each went with a parent or guardian to Immokalee High School, Golden Gate High School, and/or Lely High School to enroll, but none were accepted.  (*Id.* at ¶¶ 66-67, 70-71, 73-74, 77-78, 80, 85-89, 93-94).  School officials gave like reasons for denying enrollment – age, lack of English proficiency, insufficient academic credits, and/or ineligible to attend high school.  (*Id.* at ¶¶ 67, 71, 74, 80, 87, 89, 94).  Regardless of the reason, none of Plaintiff Children were assessed for English language proficiency or academic achievement before being denied enrollment.  (*Id.* at ¶ 97).  Pertinent here, none filed declarations of their intent to terminate school enrollment.  (*Id.*).  Defendants also maintained no records of unsuccessful enrollment attempts by recently-arrived, foreign-born ELL students ages fifteen and older.  (*Id.* at ¶ 48).

_____

[2] The facts are taken from the Amended Complaint and attachments thereto, and are assumed to be true for purposes of deciding Defendants' motion to dismiss.

[3] At the time of their attempted enrollments, Y.M. was 15, G.O., M.D., and K.V. were 16, and N.A. and T.J.H. were 17.

The School Board's Policy 5112.01, which governs the maximum age for which a person can participate in regular high school, played a central role in Plaintiff Children's enrollment denial.  (Doc. 30-2).  That policy states,

> [i]n order to provide reasonable consistency of maturity levels among students in the regular high school program, no person shall be permitted to attend the regular high school program after attaining the age of nineteen (19).  Those who attain the age of nineteen (19) during a school year may complete that school year.  Persons who are seventeen (17) years old or older and who, by earning eight (8) credits per academic year, cannot meet graduation requirements, including grade point average (GPA), prior to the end of the school year during which they attain the age of nineteen (19), shall not be permitted to attend the regular high school program beyond the end of the academic year in which they attain the age of seventeen (17).  Such persons shall be afforded an opportunity to pursue a high school diploma through the Adult High School or General Educational Development (GED) programs of the District.

(*Id.*).  This policy went into effect in August 2013.  (*Id.*).

Three Plaintiff Children – G.O., K.V. and N.A. – were denied enrollment outright and not directed to any other educational program.  (Doc. 30 at ¶¶ 52, 71-72, 80-81, 87-90).  Family or friends told them about Adult English for Speakers of Other Languages ("Adult ESOL") programs at Immokalee Technical Center ("iTech"), Barron Collier High School, and Lorenzo Walker Technical College, which had a $30.00 per semester enrollment fee.  (*Id.* at ¶¶ 60, 72, 81, 83, 90).   For the other three Plaintiff Children – Y.M., M.D., and T.J.H. – school officials directed them to iTech.  (*Id.* at ¶¶ 52, 67, 74, 94).  Neither iTech nor Lorenzo Walker allegedly provided credits toward a high school diploma, taught Florida's core curriculum, and provided access to math, science, social studies, or computer literacy.  (*Id.* at ¶¶ 19, 51, 56-58).  The programs also did not conform to the requirements of Defendants' District Plan for Services to English Language

Learners ("District ELL Plan") (Doc. 30-1), which sets forth policies and procedures for providing instruction to ELL students (Doc. 30 at ¶¶ 32-40, 51, 56).

Because of being denied access to public school, Plaintiffs bring this class action under the Equal Educational Opportunities Act of 1974 ("EEOA"), Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 1983 for violations of the Fourteenth Amendment's Equal Protection and Due Process Clauses, and Florida Educational Equity Act ("FEEA").   The Amended Complaint (Doc. 30) is the operative pleading, which Defendants now move to dismiss.

## LEGAL STANDARD

A Rule 12(b)(6) motion tests the sufficiency of a complaint under the federal pleading rules.  A claim fails this inspection if it asserts a legal theory that is not cognizable as a matter of law, or because its factual account is implausible.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 & 570 (2007).   When deciding a Rule 12(b)(6) motion, the court presumes all well-pled factual allegations to be true, resolves all reasonable doubts and inferences in the plaintiff's favor, and views the complaint in the light most favorable to the non-moving party.  *See id.* at 555.

The federal pleading requirements are far from trivial.  Although "detailed factual allegations" are not required, the rules "demand . . . more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).  A plaintiff must allege enough facts to raise his claims beyond the level of speculation, "nudging the[m] claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.  A plaintiff must do more than offer labels, conclusions, and "a formulaic recitation of the elements of a cause of action."

*Iqbal*, 556 U.S. at 678.  The court will not accept as true bald assertions, conclusions, or legal conclusions "couched" as facts.  *Id.* at 678-79; *Twombly*, 550 U.S. at 555.

For claims to survive a Rule 12(b)(6) motion, therefore, the plaintiff's allegations "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  A claim is facially plausibly where the facts alleged permit the court to reasonably infer that defendant's alleged misconduct was unlawful.  *See Id.*

## DISCUSSION

Before addressing the merits of Defendants' Motion to Dismiss, a review of Florida's education system is helpful to frame the arguments before the Court.

### A.  Florida's free public education system

The Florida Constitution guarantees a free public school education to all children residing within its borders.[4]  *Fla. Const. art. IX, § 1(a)*.  It states that "[t]he education of children is a fundamental value of the people of the State.  It is, therefore, a paramount duty of the state to make adequate provision for the education of all children in the State."  *Id.*; *see also Scavella v. Sch. Bd. of Dade Cty.*, 363 So. 2d 1095, 1098 (Fla. 1978) ("The clear implication is that all Florida residents have the right to attend this public school system for free.").  This constitutional guarantee is reflected in Florida's education statute, which requires public schools to provide thirteen (13) consecutive years of free education:

> [a]s required by s. 1 Art. IX of the State Constitution, the Florida K-20 education system shall include the uniform system of free public K-12

---

[4] The Florida Constitution does not define "children."  Nor does Florida law establish the maximum age for which a child is entitled to a free public education.  But the age of majority in Florida is eighteen years old.  *See Fla. Stat. § 743.07(1).*  Florida education law is consistent with this general provision in that it guarantees thirteen consecutive years of free public education starting at age five or six.  *See id. § 1000.01(4).*

> schools.  These public K-12 schools shall provide 13 consecutive years of instruction, beginning with kindergarten, and shall also provide such instruction for students with . . . limited English proficienc[y].

Fla. Stat. § 1000.01(4); *see also id.* § 1002.20(1) ("[A]ll K-12 public school students are entitled to a uniform, safe, secure, efficient, and high quality education.").

School attendance is compulsory for children between the ages of six and fifteen. *See id.* § 1003.21(1)(a)(1).[5]  A student may dropout at age sixteen, but only if he "files a formal declaration of intent to terminate school enrollment with the district school board." *id.* § 1003.21(1)(a)(2)(c).  Although Florida carves out an exception to allow students to withdraw from school, it still compels those students who have reached age sixteen and not graduated to attend school until the formal declaration is filed.  *See id.*.

Florida also guarantees free public education to all students regardless of their national origin.  *See* Fla. Stat. § 1000.05(2)(c).  No person may be "excluded from participating in, denied the benefits of, or be subjected to discrimination under any public K-20 education program" by a public school receiving federal or state financial assistance. *Id.* § 1000.05(2)(a).  School officials must identify and assess suspected ELL students to determine whether, and to what extent, they require language support.  *Id.* § 1003.56(1) ("Instruction in the English language shall be provided to limited English proficient students.  Such instruction shall be designed to develop the student's mastery of the four language skills, including listening, speaking, reading, and writing, as rapidly as

---

[5] The full text of § 1003.21(1(a)(1) reads, "[a]ll children who have attained the age of 6 years or who will have attained the age of 6 years by February 1 of any school year or who are older than 6 years of age but who have not attained the age of 16 years, except as otherwise provided, are required to attend school regularly during the entire school term."

possible."). Each school board must implement procedures regarding limited English proficient students that include, among other things,

- identifying limited English proficient students through assessment;

- providing limited English proficient students ESOL instruction in English and ESOL instruction or home language instruction in the basic subject areas of reading, math, science, social studies, and computer literacy; and

- providing equal access to other programs for eligible limited English proficient students based on need.

Fla. Stat. § 1003.56(3).

Here, Superintendent Patton signed the District ELL Plan in 2013, before Plaintiff Children attempted to enroll in public high school. The District ELL Plan sets forth policies and procedures regarding ELL students including their identification, evaluation, and placements. (Doc. 30 at ¶ 32; Doc. 30-1). The ELL Plan also requires schools to identify ELL students at the time of registration using a home language survey. (Doc. 30 at ¶ 33). Superintendent Patton signed the ELL in February 2013. (Doc. 30-1). In doing so, she certified that the procedures, processes, and services described in the ELL Plan complied with, among other things, the EEOA, Title VI, and the FEEA. (Id.).

**B. School Board's Policy 5112.01**

The crux of Defendants' argument is that Plaintiff Children were ineligible to attend regular high school because they could not have graduated by age nineteen and were academically ineligible to participate in high school at the time of their enrollment. (Doc. 37 at 2, 4). They stand on the School Board's Policy 5112.01 in making that argument. As stated, Policy 5112.01 excludes from high school any "persons" seventeen years or older and cannot graduate by the end of the school year during which they reach age nineteen. (Doc. 30-2). That person cannot go beyond the end of the academic year in

which they reach age seventeen.  (*Id.*).  For those students, Policy 5112.01 requires that they be "afforded an opportunity to pursue a high school diploma through the Adult High School or General Educational Development (GED) programs of the District."   (*Id.*). Defendants claim they undisputedly followed that policy here, which precludes Plaintiffs' claims as a matter of law.

Defendants devote much of their motion defending Policy 5112.01 under the School Board's home-rule power.  (Doc. 37 at 2, 4-10).  A school board's home-rule power springs from Florida's Constitution and education law – "school boards shall operate, control, and supervise all free public schools within their school districts and may exercise any power except as expressly prohibited by the State Constitution or general law."  Fla. Stat. § 1001.32(2); *see also* Fla. Const., art. IX, § 4(b).  Florida also charges local school boards with decisions regarding "admitting, classifying, promoting, and graduation of students to or from various schools of the district."  Fla. Stat. § 1003.02(1)(a).  Here, Defendants argue that they were within their authority to implement Policy 5112.01 because no federal or State law governs age and academic prerequisites for free public education.  (Doc. 37 at 2).

Defendants' reliance on home-rule misses the mark for several reasons.  Plaintiffs do not challenge the School Board's authority to implement Policy 5112.01's age-out policy.   Instead, they claim that Policy 5112.01 contravenes the EEOA, Title VI, Fourteenth Amendment, and FEEA.[6]  This is not a case in which Plaintiffs' claims infringe on Defendants' home-rule power.  All heed the School Board's authority to make that

---

[6] Defendants raise an argument based on express preemption.  (Doc. 37 at 6).  But, as Plaintiffs point out, the cases that Defendants rely on are inapposite because they address municipal ordinances and Plaintiffs are not raising a state law preemption claim.

policy.  But the home-rule power does not per se mean that Policy 5112.01 can escape aligning with applicable federal and state laws.

Defendants' reliance on Florida's compulsory school attendance to defend Policy 5112.01 fares no better.  They argue that neither general law nor Florida's Constitution require free public education to persons over the age of sixteen.  (Doc. 37 at 4-5).  That is incorrect.  Children between six and fifteen years old must attend school.  *See* Fla. Stat. § 1003.21(1)(a).  When a student reaches sixteen years old, he *may* dropout by filing a formal declaration of intent, signed by his parents, with the school district.  *Id.* at § 1003.21(1)(b).  Unless a student affirmatively quits, Florida still compels him to attend school.  *Id.* § 1003.21(1)(a)(2)(c) ("Public school students who have attained the age of 16 years and who have not graduated *are subject to compulsory school attendance* until the formal declaration of intent is filed with the district school board." (emphasis added)); *cf. id.* § 1000.01(4) (requiring public schools to provide thirteen consecutive years of instruction, beginning with kindergarten).  Contrary to Defendants' position, Florida guarantees free public education beyond age sixteen.[7]

Here, Defendants may not rely on Policy 5112.01 alone as grounds for turning away Y.M., G.O., M.D., and K.V.  All four were sixteen years or younger when they attempted to enroll in high school, and thus they had not aged out of free public education.[8]  (Doc. 30 at ¶¶ 67, 70, 74, 77).  N.A. and T.J.H. were seventeen at the time

---

[7] To decide Defendants' Motion to Dismiss, the Court need not fix the maximum age limit for which Florida provides free public education, especially since all Plaintiff Children were seventeen years or younger when they attempted to enroll in public high school.

[8] In fact, Y.M. was fifteen years old when he attempted to enroll and was subject to compulsory attendance when he was turned away from the high school.  (Doc. 30 at ¶ 67).

of their enrollment, thus triggering Policy 5112.01.  (*Id.* at ¶¶ 85, 93).  The problem is that Defendants did not follow that policy in turning them away.  According to the Amended Complaint, a friend – not the school – told N.A. about the program at Lorenzo Walker, in which he enrolled at $30.00 per semester.  (*Id.* at ¶ 90).  Indeed, the Amended Complaint alleges that a staff person at Golden Gate High School gave N.A. and his father a piece of paper that stated N.A. "was no longer eligible to pursue a traditional High School Diploma in Collier County Public Schools, including those programs offered through Alternative Programs."  (*Id.* at ¶ 89).  As for T.J.H., the Amended Complaint alleges that the school informed him about iTech, but their efforts to afford T.J.H. an opportunity to pursue a high school diploma ended there.  (*Id.* at ¶¶ 94-95).  Taking Plaintiffs' allegations as true in the Amended Complaint, Defendants' reliance on Policy 5112.01 and home-rule power to dismiss this case falls short.

Moreover, Defendants make several general arguments to defend Policy 5112.01 that are nonstarters under Rule 12(b)(6).  For example, Defendants highlight that Policy 5112.01, a facially neutral policy, is intended to control maturity levels among students in the regular high school program:

> [c]ommon sense would at least question the wisdom of placing every 16-21 year old who has been out of school for a number of years into high school. Plaintiffs' insistence on individualistic self-determination both assumes too much about their knowledge and wisdom and assumes too little about the impact of such decisions on teachers, students, and parents, which perhaps is why that determination is left to States and local school boards.

(Doc. 37 at 8-9 n.20).  The purpose of a motion to dismiss is to examine the plausibility and sufficiency of the Amended Complaint – not to assess affirmative defenses or assess the validity of the purpose for a school's policy.  Likewise, Defendants argue that, "[w]hen persons such as Plaintiffs have been out of school or are years behind linguistically and

educationally, placing them in high school would only cause them to fall further behind and set them up for failure.  Therefore, the School Board may legally refer them to English language and adult education programs where instead of falling behind they can succeed." (Doc. 37 at 12).  Again this policy-type argument is not relevant for the Court's determination whether the Amended Complaint states plausible causes of action.

Defendants also mischaracterize many of Plaintiffs' allegations.  For example, Defendants assert that "[t]he Amended Complaint alleges that the School Board as a matter of practice, pursuant to [Policy 5112.01], offers prospective enrollees who are unable to complete high school by age 19 entrance in English language and adult education programs." (*Id.* at 7).  But Plaintiffs allege that between ages fifteen and seventeen, Plaintiff Children were denied enrollment in public schools without any evaluation of their English-language proficiency and academic ability.  (Doc. 30 at ¶ 97). Defendants also assert that Plaintiffs have failed to identify a comparator group that was treated differently.  (Doc. 37 at 12).  This is incorrect.  The Amended Complaint alleges that children aged fifteen and older who are *not* recently arrived, foreign-born ELLS students are permitted to enroll in or continue receiving a free public education in Collier County schools.  (Doc. 30 at ¶ 46).

In short, although school boards possess a variant of home rule powers that provide them a broad grant of authority to act for educational purposes, that power is not limitless.  The Florida Constitution and general laws like the FEEA, EEOA, and Title VI limit it.  *See* Fla. Stat. § 1001.32(2) (permitting school boards to "exercise any power except as expressly prohibited by the State Constitution or general law"); *id.* § 1001.32(1) ("[A]ctions of district school officials shall be consistent and in harmony with state laws

and with rules and minimum standards of the state board"). Thus, home rule does not permit Defendants to promulgate policies inconsistent with federal and state law.

Having determined that the doctrine of home rule does not entitle Defendants to stand behind Policy 5112.01 to defeat this suit at the motion to dismiss stage, the Court will address each individual count in turn.

## C.  Count I: EEOA

Plaintiffs contend that Defendants denied Plaintiff Children, and similarly situated students, equal education opportunities because of their national origin by not taking action to overcome their language barriers and facilitate their equal participation in public school.  (Doc. 30 at ¶ 125).  That failure, according to Plaintiffs, violates the EEOA. Defendants disagree and move to dismiss the EEOA claim.[9]  (Doc. 37 at 10-14).

The EEOA prohibits a *State* from denying equal educational opportunities to individuals based on their national origin.  20 U.S.C. § 1703 (emphasis added).  Such a denial occurs when "the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs."  20 U.S.C. § 1703(f) (emphasis added).  An individual alleging a § 1703(f) violation must satisfy four elements: (1) defendant is an educational agency; (2) plaintiff faces language barriers that impede his equal participation in defendant's instructional programs; (3) defendant failed to take appropriate action to overcome those

---

[9] In response to the motion to dismiss, Plaintiffs assert that Defendants only seek a partial dismissal of the EEOA claim.  (Doc. 39 at 2).  Plaintiffs claim that they have made two separate claims under the EEOA.  The first is that Defendants failed to take appropriate steps to overcome Plaintiff Children's language barriers under § 1703(f).  (Doc. 30 at ¶ 125).  The second is under § 1703(a), which forbids deliberate segregation by a school based on a student's national origin.  (*Id.* at ¶ 124).  Plaintiff is correct that Defendants' motion only addresses their § 1703(f) claims.

barriers; and (4) plaintiff was denied equal educational opportunity on account of his national origin.  *See Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 132 (3d Cir. 2017) (citations and footnote omitted).  Here, there is no dispute that Plaintiffs pled the first and second elements.  This leaves the third and fourth elements at issue.

To satisfy § 1703(f)'s third element, a plaintiff must plausibly allege that the defendant failed to take appropriate action to overcome his language barriers.  *See id.* The EEOA does not define "appropriate action," and thus courts have turned to case law for guidance.  Because § 1703(f) is a provision that the Supreme Court and Court of Appeals have "infrequently applied," this Court finds illustrative the Third Circuit's recent decision in *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121 (3d Cir. 2017), whereby it affirmed a preliminary injunction against a school district in an analogous EEOA and Title VI suit.

The starting point for an EEOA analysis is *Lau v. Nicholas*, 414 U.S. 563 (1974), a pre-EEOA case.  In *Lau*, a school district did not offer English-language instruction to its Chinese students.  *Id.* at 564.  Those students sued under Title VI, which prohibits federal-funding recipients from discriminating based on national origin, race, or color.  *Id.* at 565.  Finding a Title VI violation, the Court stressed the importance of language instruction in American education:

> [t]here is no equality of treatment merely by providing students with the same facilities, textbooks, teachers, and curriculum; for students who do not understand English are effectively foreclosed from any meaningful education.  Basic English skills are at the very core of what . . . public schools teach.  Imposition of a requirement that, before a child can effectively participate in the educational program, he must already have acquired those basic skills is to make a mockery of public education.  We know that those who do not understand English are certain to find their classroom experiences wholly incomprehensible and in no way meaningful.

*Id.* at 566.

The Supreme Court later abrogated *Lau*'s interpretation on Title VI.  *See Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978); *see also Alexander v. Sandoval,* 532 U.S. 275, 283 (2001).  "In enacting § 1703(f), however, Congress embraced *Lau*'s 'essential holding' that 'schools are not free to ignore the need of limited English speaking children for language assistance.'"  *Issa*, 847 F.3d at 133 (citing *Castaneda v. Pickard*, 648 F.2d 989, 1008 (5th Cir. 1981)).

Following *Lau* and § 1703(f)'s enactment, the Fifth Circuit decided *Castaneda v. Pickard*, which is the seminal case on the EEOA.[10]  In *Castaneda*, Hispanic students sued the school district under the EEOA, alleging its failure to implement a bilingual-education program impeded their ability to overcome language barriers.  *Id.* at 992.  The Fifth Circuit found, on summary judgment, that Congress afforded state and local authorities a "substantial amount of latitude" to choose the "programs and techniques they would use" to satisfy § 1703(f).  *Id.* at 1008; *see also Horne v. Flores*, 557 U.S. 433, 440-41 (2009).  "But too much latitude, the court cautioned, would render § 1703(f) a nullity."  *Issa*, 847 F.3d at 133.  The Fifth Circuit, therefore, held that state educational agencies must make a "genuine and good faith effort, consistent with local circumstances and resources, to remedy the language deficiencies of their students" under § 1703(f).  *Castaneda*, 648 F.2d at 1009.  It also noted that Congress "deliberately placed on federal courts the difficult responsibility of determining whether the obligation [is] met."  *Id.*

From there, the Fifth Circuit created a three-part test to decide what appropriate action looks like.  *Id.*  First, courts must "examine carefully the evidence the record

---

[10] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

contains concerning the soundness of the educational theory or principles upon which the challenged program is based." *Id.*  Second, courts must decide whether the programs and practices "actually used" by the school system are "reasonably calculated to implement effectively the educational theory adopted by the school." *Id.* at 1010.  Third, if an otherwise sound and effectively implemented program fails to "produce results" indicating that language barriers are "actually being overcome," it may "no longer constitute appropriate action." *Id.*  Applying this test, the Fifth Circuit found "serious doubts" about the language competency of teachers in bilingual classrooms and remanded for an evidentiary hearing. *Id.* at 1012-13, 1015.

Here, Plaintiffs allege that Defendants took *no* action – let alone appropriate action – to overcome language barriers that impeded their equal participation in public schools. *See, e.g., Gomez v. Ill. State Bd. of Educ.*, 811 F.2d 1030, 1043 (7th Cir. 1987) ("Although the meaning of 'appropriate action' may not be immediately apparent without reference to the facts of the individual case, it must mean something more than 'no action.'").  According to the Amended Complaint, Defendants turned Plaintiff Children away at the schoolhouse steps without any English language or general academic assessment.  This refusal forced Plaintiff Children to enroll at an adult education center, which not only cost thirty dollars per semester, but also did not offer credit towards a high school diploma.  Such allegations suffice at this early stage of litigation.  *See New York by Schneiderman v. Utica City Sch. Dist.*, 177 F. Supp. 3d 739, 753 (N.D.N.Y. 2016) (finding a sufficiently pled EEOA claim where the complaint alleged that LEP immigrants "were denied equal educational opportunities on the basis of their national origin as part of a diversionary policy enacted and enforced by senior policymakers in the District").  And based on these

well-pleaded factual allegations, the Court need not delve into the specifics of *Castaneda*'s three-part test.  This is not a case in which Plaintiffs ask the Court to substitute its judgment for that of the School District's in terms of how to design, implement, or fund its ELL Plan.  Rather, this case attacks a frontline inquiry – whether Plaintiff Children were denied access to free public education available to other non-ELL children.

In short, Defendants' refusal to enroll Plaintiff Children in public school, referral to noncredit Adult ESOL programs, failure to assess their English and academic proficiency, and otherwise failure to follow the District ELL Plan, states a plausible cause of action under the EEOA.  The Court denies Defendants' Motion to Dismiss as to Count I.

### D.  Count II – Title VI

Title VI of the Civil Rights Act provides : "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  To state a claim for discrimination under this statute, a plaintiff must plausibly allege that the (1) defendant discriminated based on national origin; (2) discrimination was intentional; and (3) discrimination was a substantial or motivating factor for the defendant's actions.  *See Schneidermann*, 177 F. Supp. 2d at 752 (citations omitted).

Here, Plaintiffs allege that Defendants discriminated against Plaintiff Children based on their national origin because of Defendants' custom, policy, and practice of denying enrollment to recently arrived, foreign-born ELL students aged fifteen or older.

(Doc. 30 at ¶¶ 45, 134).  Defendants move to dismiss the Title VI claim for failure to state a claim.  For the following reasons, the Court denies the motion.

To start, Defendants argue that Plaintiffs' Title VI claim is based on their language deficiencies, not their national origin, which is not cognizable under Title VI.  (Doc. 37 at 16).  They cite *Mumid v. Abraham Lincoln High Sch.*, 618 F.3d 789 (8th Cir. 2010) for the proposition that language deficiencies and national origin are not interchangeable for Title VI's purposes.  (Doc. 37 at 16-17).  In *Mumid*, the Eighth Circuit held, "[w]hile Title VI prohibits discrimination on the basis of national origin, language and national origin are not interchangeable . . . .  A policy that treats students with limited English proficiency differently than other students in the district does not facially discriminate based on national origin."  618 F.3d at 795.  But *Mumid* is unpersuasive.  To adopt that reasoning would mean to disregard the common-sense interrelationship between limited English proficiency and national origin.  *See, e.g., T.R. v. Sch. Dist. of Philadelphia*, -- F. Supp. 3d. -- 2016 WL 6994973, at *10 (E.D. Pa. Nov. 30, 2016) (rejecting the school district's reliance on *Mumid* and finding that plaintiffs' allegations of national origin discrimination to be sufficient to state a claim under the Title VI); *United States v. Maricopa*, 915 F. Supp. 2d 1073, 1079 (D. Ariz. 2012) (stating "longstanding case law, federal regulations and agency interpretation on those regulations hold language-based discrimination constitutes a form of national origin discrimination under Title VI").  As mentioned, the Supreme Court in *Lau v. Nichols* held that a school district's failure to provide adequate ELL services to Chinese students violated Title VI's prohibition against national origin discrimination.  414 U.S. at 568.  In reaching this holding, the Court reasoned that the school district's failure caused "students who do not understand English" to be "effectively

foreclosed from any meaningful education." *Id.* at 566. Taking this body of case law together, Plaintiffs' claim under Title VI is not foreclosed. *See T.R. v. Sch. Dist. of Philadelphia*, 2016 WL 6994973, at *11 ("Nothing in the Supreme Court's reasoning in *Lau* supports [Defendants'] narrow reading of Title VI.").

Next, Defendants argue that the Amended Complaint pleads nothing more than a disparate impact theory of national origin discrimination based on the effects of Policy 5112.01, which Title VI does not recognize. (Doc. 37 at 14). They make this argument despite the Amended Complaint alleging that Defendants' policy "was adopted and is enforced with the intent to discriminate against Plaintiff Children and other similarly-situated students on the basis of their national origin," and Defendants "acted intentionally or with deliberate indifference" to their rights. (Doc. 30 at ¶¶ 134, 147). The Amended Complaint further alleges that Defendants failed to maintain records of recently arrived, foreign-born ELL students age fifteen and older who seek to enroll in public school but are turned away. (*Id.* at ¶¶ 48, 138). Taken together, these allegations more than suffice to state a claim for intentional discrimination. *See Schneidermann*, 177 F. Supp. 3d at 752 (denying school district's motion to dismiss Title VI claim where the complaint alleged ELL immigrant students were diverted into "alternative, unequal educational settings" and normal recordkeeping practices were ignored "resulting in these student's enrollment attempts not being captured").

Even if Plaintiffs allege intentional discrimination, Defendants argue that the Title VI claim fails under the burden-shifting standard set forth in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). (Doc. 37 at 14). That argument falls short. "The prima facie case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement."

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002). "This Court has never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." *Id.* at 511; *see McCone v. Pitney Bowes, Inc.*, 582 F. App'x 798, 801, n.4 (11th Cir. 2014) (noting that *Twombly* "had no impact on *Swierkiewicz's* statement that a plaintiff is not required to plead a prima facie case of discrimination in order to survive dismissal"). Not to mention, the *McDonnell Douglas* burden-shifting standard applies to Title VII employment discrimination cases. The Court declines to apply *McDonnell Douglas*' burden-shifting framework to the Title VI claim at this stage.

Reviewing the well-pleaded facts in a light most favorable to Plaintiffs, the Court finds they state an actionable Title VI claim. In *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-67 (1977) the Court stated that deciding whether discriminatory intent was a motivating factor in decision-making requires analysis of direct and circumstantial evidence. Courts may, among other things, examine any outsized impact on a protected class, the historical background of the decision, the specific sequence of events leading up to the decision, procedural and substantive departures from the norm, and legislative or administrative history to determine if sufficient evidence of discriminatory intent exists. *Id.* at 266-68. Here, Plaintiffs allege that at least 369 foreign-born students under the age of eighteen were attending a Collier County Adult ESOL program instead of regular public school. (Doc. 30 at ¶ 106). They also assert that "[d]uring a January 2013 School Board Workshop meeting discussing the proposed [Policy 5112.01], Board members raised a concern about the Policy's impact on currently enrolled students. District employee Christy Kutz emphasized that the Policy was

targeted at 'new kids enrolling at our schools.'" (*Id.* at ¶ 47).  And Defendants allegedly departed from Policy 5112.01 in that they did not offer Plaintiff Children an opportunity to pursue a high school diploma or GED.

Finally, Defendants argue that Policy 5112.01 results in permissible ability grouping based on educational achievement.  (Doc. 37 at 14).  This argument is equally untenable.  Ability grouping involves "group[ing] students into different academic tracks based on their abilities, [as] determined by testing and other measures of academic ability."  *Holton v. City of Thomasville Sch. Dist.*, 490 F.3d 1257, 1259 (11th Cir. 2007).  *Holton*, which Defendants rely on heavily, is a school desegregation case in which the Supreme Court examined the lawfulness of a school district's ability-grouping policy.  *Id.* at 1259.  The Court stated ability-grouping practices are not per se unconstitutional despite the effect they may have on creating racial imbalances in classrooms.  That said, the Court noted that ability-grouping programs are permissible "if the assignment method 'is not based on the present results of past segregation or will remedy such results through better educational opportunities."  *Id.* at 1262 (internal quotations and footnote omitted).

Unlike the ability-grouping practice upheld in *Holton*, the Amended Complaint alleges that Defendants outright denied public school enrollment to recently arrived, foreign-born ELL students without any language or academic assessments.  The students in *Holton*, however, attended school with their peers but were assigned to different classes based on their assessed ability.  Plaintiff Children never crossed the schoolhouse doors.  Defendants' ability grouping argument is not persuasive.

For these reasons, Defendant's Motion to Dismiss on Count II is denied.

**E.  Counts III and IV – 42 U.S.C. § 1983**

The Fourteenth Amendment prohibits any state from "depriv[ing] any person of life, liberty, or property, without due process of law" or denying "any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  To give the Fourteenth Amendment teeth, Congress enacted 42 U.S.C. § 1983.  That section authorizes individuals to sue states or officials who act under color of state law for violating certain federal laws and federal constitutional rights.  To prove a claim under § 1983, a person must show that state action caused that person to be deprived of his or her constitutional rights.  When suing a local governmental entity such as a school board, a plaintiff must also show that an official government policy, government custom or practice, or the act of an official with final policy-making authority caused the constitutional violation.  *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978); *Denno v. Sch. Bd. of Volusia Cty.,* 219 F.3d 1267, 1276 (11th Cir. 2000).  Here, Plaintiffs assert equal protection and due process claims under the Fourteenth Amendment.  The Court will address each claim in turn.

1.  *Count III – Equal Protection*

As mentioned, the Equal Protection Clause provides that no State may "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  Because Title VI and equal protection claims are considered under the same analytical framework, the Court denies Defendants' Motion to Dismiss the equal protection claim for the same reasons above.

That aside, the Amended Complaint alleges, among other things, that Defendants enacted Policy 5112.01, which was an ongoing policy of intentionally denying recently-

arrived, foreign-born students aged sixteen and older enrollment in free public high school.  That policy forced them to seek out and pay for unequal education programs because of their national origin and status as foreign-born ELL students.   These allegations plead a viable claim.  *See Schneiderman*, 177 F. Supp. 3d at 751 (finding a plausible equal protection claim where the complaint alleged that "senior District officials enacted and directed the enforcement of an ongoing policy of deliberately diverting students aged 17-20 seeking to enroll at Proctor High School into alternative, unequal education programs based on the actual or perceived states of those students as LEP and/or immigrants").

Notwithstanding the foregoing, Defendants argue that, even if Plaintiffs pled sufficient facts of unequal treatment, they only alleged that some unnamed school official did the discriminating.  (Doc. 37 at 18).  Plaintiffs respond this is inaccurate because the Amended Complaint alleges that the constitutional deprivation resulted from Defendants' policy or custom.  *See Monnell*, 436 U.S. at 694.  The Court agrees.  Plaintiffs have alleged that Defendants excluded them from free public education pursuant to Policy 5112.01.  (Doc. 30 at ¶¶ 1, 4, 45, 64, 144, 145, 148, 157, 166).  The Court, therefore, finds that Plaintiffs state a plausible equal protection claim.  The Court denies Defendants' Motion to Dismiss on Count III.

2. *Count IV – Due Process*

To state a procedural due process violation, as Plaintiffs allege here, the plaintiff must show a deprivation of a constitutionally protected property or liberty interest. "Because Florida gives students a statutory and state constitutional right to a public school education, courts treat the right to an education as a property interest protected

by the Fourteenth Amendment." *Anderson v. Hillsborough Cty. Sch. Bd.*, No. 808-cv-772-T-24TBM, 2009 WL 3669634, at *4 (M.D. Fla. Oct. 30, 2009), *aff'd,* 390 F. App'x 902 (11th Cir. 2010). This means, "a state may not arbitrarily deprive a student of their education without a minimum amount of due process that includes notice and an opportunity to be heard, appropriate to the nature of the case." *Id.*

Here, Plaintiff Children allege that Defendants violated their right to procedural due process when Defendants excluded them from public school without notice or an opportunity to be heard. (Doc. 30 at ¶¶ 155-56). Plaintiffs were neither provided notice, nor given any opportunity to challenge their exclusion from public school. (*Id.* at ¶¶ 67, 71, 74, 80, 87, 89, 94, 97). On the other hand, Defendants argue that Plaintiff Children enjoy no property right to a free public education because they had no right to attend regular high school under Florida law.

The Court finds that the Amended Complaint provides sufficient factual allegations that Defendants turned Plaintiff Children away without any English proficiency or academic assessment. Nor did they give them an opportunity to challenge their enrollment denial. Not to mention, Defendants denied their enrollment in a manner inconsistent with the District ELL Plan. (Doc. 30-1). Because Plaintiffs sufficiently allege that Defendants denied their property interest in a free and appropriate education, Plaintiffs have stated a viable due process claim. The Court denies Defendants' Motion to Dismiss on Count IV.

## F.  Count V – Florida Educational Equity Act

The Florida Educational Equity Act ("FEEA") prohibits discrimination based on national origin against a student in the state system of public K-20 education. Fla. Stat.

§ 1000.05(2)(a).  "No person in this state shall, on the basis of . . . national origin . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any public K-20 educational program or activity, . . . conduct by a public educational institution that receives or benefits from federal or state financial assistance."  *Id.*  The statute also provides that "[t]he criteria for admission to a program or course shall not have the effect of restricting access by persons of a particular . . . national origin[.]"  *Id.* § 1000.05(2)(b).  Also, "[a]ll public K-20 education classes shall be available to all students without regard to . . . national origin . . .; however, this is not intended to eliminate the provision of programs designed to meet the needs of students with limited proficiency in English[.]"  *Id.* § 1000.05(2)(d).

Defendants move to dismiss Plaintiffs' FEEA claim on the ground that Plaintiffs fail to allege the pre-suit notice requirements of Florida Statute § 768.28(6)(a), which sets forth the state's waiver of sovereign immunity.  It provides, in relevant part, "[a]n action may not be instituted against [a state agency or subdivision] unless the claimant presents the claim in writing to the appropriate agency, and also, except as to any claim against a municipality . . . presents such claim in writing to the Department of Financial Services, within 3 years after such claim accrues and the Department of Financial Services or the appropriate agency denies the claim in writing[.]"  Fla. Stat. § 768.28(6)(a).  Because this requirement is a condition precedent, Defendants argue that the FEEA claim should be dismissed.

This argument is incorrect.  Plaintiffs' claim under the FEEA is not subject to § 768.28(6)(a)'s pre-suit notice requirement.  The Florida Supreme Court has held that pre-suit notice is not required where the governing statute authorizes a lawsuit against

the state and does not refer to § 768.28(6).  *See Bifulco v. Patient Bus. & Fin. Servs., Inc.*, 39 So. 3d 1255, 1257-58 (Fla. 2010) ("When the Legislature has intended particular statutory causes of action to be subject to the requirements of section 768.28(6), it has made its intent clear by enacting provisions explicating stating that 768.28(6) applies.").  And pre-suit notice is not required here because the FEEA authorizes discrimination suits against "public educational institution[s]."  Fla. Stat. § 1000.05(2)(a).

In addition, Florida courts have rejected application of § 768.28(6) to remedial civil rights statutes that, like the FEEA, that confer a private right of action and specify available forms of relief.  *See Maggio v. Fla. Dep't of Labor & Emp't Sec.*, 899 So. 2d 1074, 1080 (Fla. 2005) (state Civil Rights Act); *Fla. Dep't of Educ. v. Garrison*, 954 So. 2d 84, 86 (Fla. 1st DCA 2007) (Public Whistleblower's Act).  The FEEA confers a private right of action for injunctive relief.  *See* Fla. Stat. 1000.05(7).  In contrast, "[t]he sole purpose of the enactment of section 768.28 was to waive sovereign immunity for breaches of common law torts."  *Schaeffer v. Sch. Bd. of Broward Cty., Fla.*, 69 F. Supp. 3d 1327, 1330 (S.D. Fla. 2014) (internal quotations and citation omitted).  Count V survives.

## G. Superintendent Patton as a Named Defendant

Next, Defendants argue that to the extent Plaintiffs sue Superintendent Patton in her individual capacity, those claims should be dismissed.  Plaintiffs clarify, however, that they bring all counts against Superintendent Patton in her official capacity only.[11]  (Doc. 39 at 23).

---

[11] Although Plaintiffs state that they bring "Counts I, III, IV, and V" against Superintendent Patton in her official capacity, it appears to be a scrivener's error that they omitted Count II.  (Doc. 39 at 23).

Regarding suing Superintendent Patton in her official capacity, Defendants argue that the Title VI and § 1983 claims still must be dismissed.  First, Defendants claim that Plaintiffs cannot sue Superintendent Patton under Title VI because she is not a recipient of federal funds.  (Doc. 37 at 21).  Plaintiffs offer no response.  (Doc. 39 at 23-24).   That is likely because "[t]he text of Title VI also precludes liability against those who do not receive federal funding, including individuals." *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1170 (11th Cir. 2003); *see also Pouyeh v. UAB Dep't of Ophthalmology*, 625 F. App'x 495, 498 (11th Cir. 2015) (finding "no individual liability under Title VI"); *see also Barnett v. Baldwin Cty. Bd. of Educ.*, 60 F. Supp. 3d 1216, 1234 (S.D. Ala. 2014) (explaining that "liability was limited to recipients of federal funding" and "those who are in a position to accept or reject" the federally imposed conditions attendant to receipt of the funds, "as part of the decision whether or not to 'receive' federal funds"); *Godby v. Montgomery Cty. Bd. of Educ.*, 996 F. Supp. 1390, 1413 (M.D. Ala. 1998) ("Because Title VI liability is based on a contractual-type relationship between the federal government and the receiver of a federal grant, only the local school district which actually receives the federal money may be held liable-not an employee of the entity.").  Against this case law, the Court agrees with Defendant.

Second, Defendants argue that the § 1983 claims are duplicative against Superintendent Patton and the School Board.  (Doc. 37 at 22 n.27).  The Court also agrees.  *See DeSisto Coll., Inc. v. Line*, 888 F.2d 755, 764 (11th Cir. 1989) (stating "a plaintiff need no longer bring official-capacity actions against local government officials since the local government could now be sued directly").

Plaintiff relies on *C.P. by & through Perez v. Collier Cty.*, 145 F. Supp. 3d 1085, 1089 (M.D. Fla. 2015) in arguing that dismissal of an agency head is not mandatory absent a concern of jury confusion.  But that case is distinguishable because the court declined to dismiss the official capacity claims against a sheriff because of the inconsistency in Florida' official-capacity jurisprudence for officers.  Here, there is no such inconsistency because Florida law is clear that Superintendent Patton operates as the secretary and executive officer of the School Board.  Fla. Stat. § 1001.32 ("Responsibility and management of the schools and for the supervision of instruction in the district shall be vested in the district school superintendent as the secretary and executive officer of the district school board, as provided by law.").  Consequently, the § 1983 claims are duplicative as against the School Board and Superintendent Patton.  *See Cunningham v. Sch. Bd. of Lake Cty.*, No. 5:15-CV-480-OC-30PRL, 2016 WL 1755612, at *2 (M.D. Fla. May 3, 2016).

Finally, Defendants argue that Florida Statute § 768.28(9)(a) prevents any suit against the superintendent because of sovereign immunity.  (Doc. 37 at 23).  But Plaintiff argues, and the Court agrees, that § 768.28 does not apply to the FEEA claim.  (Doc. 39 at 24).

Based on the foregoing, the Court will dismiss the Title VI (Count II) and § 1983 claims (Count III and IV) as to Superintendent Patton.  But the remaining claims (Count I and V) survive.

## H.  Standing

In their final effort to dismiss the Amended Complaint, Defendants argue that Plaintiffs lack standing because they have aged out of the regular public school system.

(Doc. 37 at 23).  Consequently, they maintain any order directing them to conform to the EEOA, Title VI, and the Fourteenth Amendment will not redress Plaintiffs' alleged injuries. (*Id.*).  Defendants again rely on the Eighth Circuit decision in *Mumid* to support this argument.  Doc. 37 at 23-24).  Plaintiffs respond, however, that Florida law provides Plaintiff Children a right to attend public school, and thus Defendants' argument they have not suffered a concrete injury because they "aged out" or were "academically unqualified for" school is incorrect.  (Doc. 39 at 24).  The Court agrees with Plaintiffs.

Defendants' reliance on *Mumid* is misplaced.  There, plaintiffs sought injunctive relief in the form of closing the high school or barring it from certain practices.  (Doc. 39 at 24-25).  The Eighth Circuit held that the plaintiffs lacked standing to seek that relief because they had graduated or aged out of the public school system, which the state law capped at age twenty-one.  *Mumid*, 618 F.3d at 789.  Here, all but one Plaintiff Child remains seventeen years or younger.  And that sole outlier is eighteen.  Moreover, their claims for equitable relief have not been trumped by an intervening circumstance.  *See Issa*, 847 F.3d at 126 n.2 (directing the district court to dismiss two of the plaintiffs who had earned a high school diploma and wished to attend community college because their claims for equitable relief became moot).  The Court denies Defendants' Motion to Dismiss for lack of standing.

In conclusion, the Court denies Defendants' Motion to Dismiss on all grounds excep two.  It dismisses the Title VI (Count II) and § 1983 claims (Count III and IV) as to Superintendent Patton only, but allows those claims to move forward as against the School Board.

Accordingly, it is now

**ORDERED:**

(1) Defendants School Board of Collier County, Florida and Kamela Patton's Motion to Dismiss (Doc. 37) is **GRANTED in part and DENIED in part**.  It is granted only to the extent that Counts II, III, and IV as against Defendant Kamela Patton are dismissed – those counts survive as against the School Board.  The motion is denied in all other respects.

(2) Defendants shall file an answer to the Amended Complaint in accordance on or before **April 3, 2017.**

**DONE** and **ORDERED** in Fort Myers, Florida this 17th day of March 2017.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  All Parties of Record